1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11  GEORGE A. BROOKS; BROOKS
    INDUSTRIES, INC.,

12                                        Plaintiffs,

13          vs.

14  MOTSENBOCKER ADVANCED
    DEVELOPMENTS, INC.; GREGG A.

15  MOTSENBOCKER; SKIP A.
    MOTSENBOCKER,

16
                                        Defendants.

17

CASE NO. 07cv773 BTM(NLS)

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
SUMMARY JUDGMENT**

18
19          Defendants have filed a motion for summary judgment against Plaintiffs.  For the

20  reasons discussed below, Defendants' motion is **GRANTED IN PART** and **DENIED IN
    PART**.

21

22                          I.  **FACTUAL BACKGROUND**

23          Plaintiff George A. Brooks ("Plaintiff" or "Brooks") explains that in May of 1997, he

24  purchased a bottle of "Motsenbocker's Lift Off" Graffiti Remover in a Maryland store.  (Brooks

25  Decl. ¶ 2.) This product ("Product") was a biodegradable, water-based, nonflammable, liquid

26  cleaner used to remove paint and paint-like coverings and deposits.  (Id.)  Brooks tried using

27  the Product as a stripper for removing clear-coat from brass.  (Id.)  Brooks's testing showed

28  that the Product worked well as a stripper of metal.  (Id.)  Brooks performed the testing

1  because he believed that there was a need in the industry for a good water-based brass

2  stripper. (Id.)

3      Brooks states that in May of 1997, he called Motsenbocker Advanced Developments,

4  Inc. ("MAD"), and spoke to Gregg Motsenbocker ("Gregg"). (Id. at ¶ 3.)  After Gregg assured

5  Brooks that he would not steal Brooks's ideas, Brooks explained to Gregg that as a result of

6  deaths of workers while stripping brass with flammable strippers, there was a great need for

7  a non-flammable brass stripper in the painting industry. (Id. at ¶ 4.)  At Brooks's suggestion,

8  they began referring to the Product as "Brass Wash."  (Id.)

9      In approximately June of 1997, per Gregg's request, Brooks demonstrated the use of

10  the Product to Stuart Dean and Aztec, large metal refinishers, and a company called Reemco

11  in New York.  (Id. at ¶ 5.)  In July 1997, Gregg requested that Brooks demonstrate the

12  Product to Walt Noga ("Noga") of Ecolab, Inc. ("Ecolab"), the company that possessed the

13  exclusive rights to market the Product wholesale. (Id. at ¶ 6.)

14      In or about August of 1997, Ecolab agreed to pick up the Product (now named "Brass

15  Wash").  (Id. at ¶ 7.)  According to Brooks, he entered into a written contract with Ecolab

16  which made Brooks the exclusive North American sales representative of the Product sold

17  as a stripper to remove coatings such as paint, lacquers, and varnish. (Id.)  Under the terms

18  of the agreement, Brooks was to be paid exclusively by commission, earning 12% of the first

19  million dollars in sales, 10% of the next half million, and 8% thereafter. (Id.)  Brooks was to

20  receive commissions on all North American wholesale sales whether he initiated the sale or

21  not, and was to receive such for as long as Ecolab had the right to distribute the Product.

22  (Id.)  Brooks does not have a copy of the agreement.  According to Ecolab, any such

23  agreement was destroyed under Ecolab's retention program.  (Ex. B to Brooks Decl.)

24      In or about 1998, Brooks further experimented with the Product and discovered it

25  worked as a remover of paint from wood without damage to the part or the panel. (Id. at ¶

26  12.)

27      In 1999, in addition to working with the Product, Brooks worked with the Sherwin

28  Williams Company to develop a water-based clear coat  to protect metal and wood that could

1  be removed with the Product without leaving a stain on the metal.  (Id. at ¶ 8.)  Brooks

2  perfected the covering, Sherwin Williams produced it, and MAD marketed it under the name

3  "Motsenbocker's Lift Off Finish Coat" (hereinafter "Finish Coat").  (Id.)

4      In 1999, shortly after the perfection of the Finish Coat, Gregg told Brooks that MAD

5  was ending its relationship with Ecolab.  (Id. at ¶ 9.)  Gregg, on behalf of MAD, offered to

6  engage Brooks as the North American sales representative for the Product and Finish Coat.

7  (Id.)  MAD and Brooks entered into an oral agreement ("Agreement") with the same terms

8  as the agreement with Ecolab except that (1) Brooks's commission on the sale of the Product

9  and Finish Coat would be a flat 10% of all sales, wholesale or retail; (2) Brooks was free to

10  market the Produce under whatever name Brooks and MAD agreed upon; and (3) MAD and

11  Brooks would work together to vary the formula if doing so would improve it.  (Id.)  According

12  to Brooks, it was agreed that Brooks would start marketing the Product as soon as Ecolab

13  was no longer marketing the Product, and that Brooks's contract would be for the lifetime of

14  the Product. (Id. at ¶ 10.)

15      In October 2004, Brooks traveled to San Diego and was employed by MAD until May

16  2005.  According to MAD, Brooks was employed as a "warehouseman."  (Motsenbocker

17  Decl. ¶ 8.)  Brooks denies that he was a "warehouseman."  Brooks contends that he was

18  employed as a salesman for MAD's other products and was given the title "PK for Product

19  Knowledge."  (Brooks Decl. ¶ 26.)  During his employment, he did not work on the Product

20  or Finish Coat during Company time, but, rather, promoted the Product and Finish Coat after

21  hours and on weekends.  (Id.)

22      In 2000, under the Agreement, Brooks began marketing the Product and conducted

23  experiments to further develop it.  (Id. at ¶ 11.)  In 2000, Brooks promoted the Product as

24  "Coating Remover," and in 2001, Brooks began marketing it under the additional name,

25  "Lacquer Remover."  (Id.)  In 2001 through 2004, Brooks further experimented with the

26  Product and made some of the Product into gel form and distributed samples of the Product

27  in that form.  (Id. at ¶ 14.)  Brooks's marketing efforts from 2000 to May, 2005 include the

28  following:

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- A 2000 trip to Des Moines, Iowa, which resulted in a highly positive review of the Product in The Wood Magazine.
- A 2000 trip to Chicago to demonstrate the Product at a national hardware show.
- A 2002 trip to Washington, D.C., to demonstrate the Product at the True Value Ace Hardware Show.
- 2003 trips to Stuart Dean offices throughout the United States to give training presentations on how to use the Product.
- Trips to the Metal Polishers Union Meany training center in 2000, 2001, 2003, 2004, and 2005.
- Promotion of the product at a 2005 trade show in New Orleans.
- Promotion of the Product in 2003 in San Diego and Los Angeles

(Id. at ¶¶ 16-25.)

During the period between 1999 and May, 2005, Brooks also entered into contracts for the performance of services (e.g., refinishing brass elevators) using the Products.  (Id. at ¶ 34.)  According to Brooks, the profits from these contracts were minimal or non-existent.  (Id.)  However, these contracts provided opportunities to show how well the Product worked and to obtain endorsements.  (Id.)

From 1999 to 2005, Brooks wrote the following materials to promote the Product: a 1999 book entitled "The Proper Techniques and Procedure for Applying and Using Motsenbockers Liftoff Lacquer Remover and Motsenbockers Liftoff Finish Coat for the Purpose of and How to Refinish Wood & Metal" (modified in 2001); a 2003 booklet entitled "Product Information Booklet" for the Lacquer Remover and Finish Coat; a 2003 booklet entitled "Safe & Simple Step-by-Step Instructions on How to Restore and Clean Mirror & Satin Finish Brass"; and various sales fliers and product definitions.  (Id. at ¶ 27.)  Defendants reviewed these writings and distributed them to those interested in the Product.  (Id. at ¶¶ 28-29.)

From 1999 to 2005, Brooks also made the following videos demonstrating how to use

4

1  the Product for various purposes: "Oxidize Brass in 40 Minutes"; "Satin Finish Brass in 30

2  Minutes"; "Refinish Brass/Wood Basic Steps"; "Finish Coat & Lacquer Remover"; "How to

3  Restore a Satin Finish Elevator"; "A Mirror Finish 2003"; "How to Restore a Mirror Finish

4  Elevator"; and "Metal & Wood." (Id. at ¶¶ 30-31.)  Defendants reviewed the videos and

5  distributed them to those interested in the Product. (Id. at ¶¶ 32-33.)

6        Until early 2005, only approximately $30,000 worth of the Product had been sold. (Id.

7  at ¶ 38.)  During this time, MAD performed services for Brooks, such as graphic art work and

8  the production of Brooks's written materials, and charged those services against the

9  commissions Brooks earned. (Id.)  In early 2005, a sale was made to Stutz Corporation for

10  between $5,000 and $6,000. (Id.)  Brooks never received a commission for this sale.

11        In October or November of 2004, Gregg asked Brooks to prepare Skip Motsenbocker

12  to make a presentation of the Product and Finish Coat to Home Depot. (Id. at ¶ 39.)  Skip

13  was to present MAD's full line of products.  Brooks gathered together his materials and

14  information for Skip's presentation.  When Skip returned to San Diego, he indicated that

15  Home Depot had purchased a latex paint remover.  Brooks voiced concern that Defendants

16  might be trying to deceive him.  However, Brooks was assured that MAD would honor its

17  contract with him.

18        In or about May 2005, Gregg told Brooks that MAD would not be paying him

19  commission on the Product. (Id. at ¶ 40.)  From January, 2005 to December, 2007, Home

20  Depot sold 62,500 units of "Lift off Paint & Varnish Remover" for a total of $623,394. (Ex. A

21  to Shenas Decl.)  Brooks claims that "Lift off Paint & Varnish Remover" is another name for

22  the Product.

23        MAD has refused to pay Brooks a commission on sales of the Product. (Brooks Decl.

24  ¶ 41.)  MAD has also refused to pay Brooks a commission on sales of Finish Coat. (Brooks

25  Decl. ¶ 42.)  According to Brooks, from 1999 to 2005, MAD sold approximately $20,000

26  worth of Finish Coat, with Brooks earning a commission of approximately $2,000. (Id.)

27  ///

28  ///

## II.  **PROCEDURAL HISTORY**

Plaintiffs commenced this suit on April 27, 2007.  The First Amended Complaint asserts the following causes of action: (1) Breach of Contract (by Brooks regarding payment of commissions on sales of the Product); (2) Breach of Contract (by Brooks Industries regarding failure to pay commissions on sales of the Product); (3) Quantum Meruit; (4) Unjust Enrichment; (5) Promissory Estoppel/Detrimental Reliance; (6) Tort Arising From Breach of Contract; (7) Misrepresentation; (8) Negligent Misrepresentation; (9) Breach of Fiduciary Duties; (10) Accounting; (11) Declaratory Relief; (12) Breach of Contract (regarding failure to pay commissions on sales of Finish Coat); and (13) Unlawful Contract (in violation of Cal. Civil. Code § 1738.15).

## III.  **STANDARD**

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial.  Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the

1  burden shifts to the nonmoving party to set forth facts showing that a genuine issue of

2  disputed fact remains.  <u>Celotex</u>, 477 U.S. at 314.  The nonmoving party cannot oppose a

3  properly supported summary judgment motion by "rest[ing] on mere allegations or denials

4  of his pleadings."  <u>Anderson</u>, 477 U.S. at 256.  When ruling on a summary judgment motion,

5  the court must view all inferences drawn from the underlying facts in the light most favorable

6  to the nonmoving party.   <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

7  587 (1986).

8

9                            **IV.  <u>DISCUSSION</u>**

10        Defendants move for summary judgment on all of Plaintiffs' claims.  As discussed

11  below, Defendants' motion is granted in part and denied in part.

12

13  A.  <u>Contract and Related Claims</u>

14        Defendants contend that there is no triable issue of material fact with respect to

15  whether there was an oral contract between MAD and Plaintiffs.  The Court disagrees.

16        Citing <u>Notten v. Mensing</u>, 3 Cal. 2d 469 (1935), and cases citing <u>Notten</u>, Defendants

17  argue that Plaintiffs must establish the existence of an oral contract by *clear and convincing*

18  *evidence*.  However, in <u>Weiner v. Fleischman</u>, 54 Cal. 3d 476, 486 (1991), the California

19  Supreme Court held that "the decisional law does not justify or require a departure from the

20  ordinary civil standard of 'preponderance of the evidence' when a party seeks to establish

21  the existence and scope of an oral joint venture or partnership agreement."  Thus, the

22  preponderance of the evidence standard applies here.

23        "Where the existence of a contract is at issue and the evidence is conflicting or admits

24  of more than one inference, it is for the trier of fact to determine whether the contract actually

25  existed."  <u>Robinson & Wilson, Inc. v. Stone</u>, 35 Cal. App. 3d 396, 407 (1973).  In this case,

26  Brooks states that he and MAD entered into an oral contract whereby the parties agreed that

27  Brooks would be the North American representative for the Product and Finish Coat for the

28  lifetime of the Product and that Brooks would be entitled to 10% commission on all sales of

1    the Product or Finish Coat.  (Brooks Decl. ¶¶ 9-10.)  Gregg Motsenbocker denies ever

2    entering into such an agreement.  (Motsenbocker Decl. ¶¶ 4-5.)  Accordingly, there is a

3    dispute of fact regarding the existence of an oral contract.

4        Defendants argue that Brooks's claims regarding the existence of an oral contract are

5    implausible and that Brooks's self-serving testimony is insufficient to create a genuine issue

6    of material fact.   Although courts may refuse to draw implausible inferences from

7    circumstantial evidence on summary judgment, "[i]f the nonmoving party produces direct

8    evidence of a material fact, the court may not assess the credibility of this evidence nor

9    weigh against it any conflicting evidence presented by the moving party." McLaughlin v. Liu,

10   849 F.2d 1205, 1209 (9th Cir. 1988) (quoting T.W. Elec. Serv. v. Pacific Elec. Contractors

11   Ass'n, 809 F.2d 616, 631-32 (9th Cir. 1987)).  Brooks's declaration is direct evidence of the

12   existence of an oral contract, and it is not the Court's role to judge Brooks's credibility.

13       Brooks can rely on his declaration to create a triable issue.  As noted by the Ninth

14   Circuit in United States v. Shumway, 1993 F.3d 1093, 1104 (9th Cir. 1999), an affidavit by

15   a party is usually worth submitting only if it is "self-serving."  "That an affidavit is self-serving

16   bears on its credibility, not on its cognizability for purposes of establishing a genuine issue

17   of material fact." Id.   Thus, "self-serving affidavits are cognizable to establish a genuine

18   issue of material fact so long as they state facts based on personal knowledge and are not

19   too conclusory." Rodriguez v. Airborne Express, 265 F.3d 890, 902 (9th Cir. 2001).  Brooks's

20   declaration is based on personal knowledge and sets forth specific facts supporting the

21   existence of an oral contract.

22       Defendants argue that Plaintiffs' contract claims are barred by the statute of

23   limitations.  The statute of limitations for a breach of an oral contract is two years.  Cal. Civ.

24   Proc. Code § 339.  Therefore, Plaintiffs can sue for breaches of the contract that occurred

25   within the two-year period prior to April 27, 2007.  In other words, Plaintiffs can seek recovery

26   of amounts that became due under the Agreement during the two-year period.  For example,

27   Plaintiffs have presented evidence creating a triable issue with respect to whether they are

28   owed commissions for sales of the Product to Home Depot during the two-year period.

07cv773 BTM(NLS)

1   The fact that Plaintiffs cannot recover for breaches of the Agreement that occurred

2   outside the limitations period does not bar Plaintiffs from suing for breaches that occurred

3   within it.  Because the commission payments owed under the Agreement were divisible from

4   one another, the statute of limitations runs from the date each payment became due.  See

5   Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co., 116 Cal. App. 4th 1375 (2004)

6   (holding that monthly payments were divisible from each other and that a new cause of

7   action for breach accrued periodically);  Conway v. The Bughouse, Inc., 105 Cal. App. 3d

8   194, 199-200 (1980) (explaining that the contract at issue was an installment contract and

9   holding that the statute of limitations ran from the date of each installment).

10   Therefore, the Court grants Defendants' motion for summary judgment on Plaintiffs'

11   breach of contract claims (Counts I, II, and XII) but only to the extent that Plaintiffs seek to

12   recover for breaches of the contract that occurred prior to April 27, 2005.  The Court also

13   grants  Defendants'  motion  for  summary  judgment  on  Count  V  (promissory

14   estoppel/detrimental reliance), which is also governed by a two-year statute of limitations,

15   to the extent that Plaintiffs seek to recover for promises breached prior to April 27, 2005.

16   Otherwise, the Court denies the motion for summary judgment on the contract claims and

17   promissory estoppel claim..

18   The Court also denies the motion for summary judgment with respect to the claims

19   arising out of the contractual relationship between the parties.  Specifically, the Court denies

20   the motion with respect to Count IX (breach of fiduciary duties)[1] and Count XI (declaratory

21   relief).

22   The Court grants the motion for summary judgment on Count VI, "Tort Arising From

23   Breach of Contract."  Under California law, "conduct amounting to a breach of contract

24   becomes tortious only when it also violates a duty independent of the contract arising from

25   principles of tort law."  Erlich v. Menezes, 21 Cal. 4th 543, 551 (1999).  Plaintiffs have not

26   established that the breach of contract also violated a duty completely independent of the

27

28   [1]  The Court notes that the statute of limitations for breach of fiduciary duty is four years.  Cal. Civ. Proc. Code § 343.

9

1   contract and are not entitled to tort damages for the breach of contract.

2

3   B.  <u>Fraud Claims</u>

4        In Count VII (Misrepresentation) and Count VIII (Negligent Misrepresentation),

5   Plaintiffs allege that although Defendants made representations through May 2005 that they

6   intended to pay Plaintiffs a commission under the Agreement on all North American Sales

7   of the Product, Defendants did not intend to do so and made the false representations with

8   the intention of inducing Plaintiffs to promote and develop the Product in North America.

9        Defendants contend that Plaintiffs' fraud claims are barred by the applicable statute

10  of limitations because the alleged fraudulent conduct commenced in 1999.  The statute of

11  limitations for fraud claims is three years.  Cal. Civ. Proc. Code § 338(d).

12       However, a cause of action for fraud is not deemed to accrue until the discovery by

13  the aggrieved party of the facts constituting the fraud or mistake.  Under the discovery rule,

14  the statute of limitations begins to run when the plaintiff has information which would put a

15  reasonable person on inquiry.  <u>Kline v. Turner</u>, 87 Cal. App. 4th 1369, 1374 (2001).

16       Based on Plaintiffs' evidence, Brooks arguably was not aware of the alleged fraud until

17  May, 2005.  According to Brooks, although he was never paid the $2,000 in commissions

18  owed in connection with sales of Finish Coat, he was earning commissions on the books for

19  sales of the Product until early 2005. (Brooks Decl. ¶ 38.) These commissions were not paid

20  out because services provided by MAD were charged against them.  (<u>Id.</u>)  Accordingly,

21  viewing the evidence in the light most favorable to Plaintiffs, Brooks did not have reason to

22  know that Defendants did not intend to pay out any commissions under the Agreement until

23  May, 2005, when Gregg told Brooks that MAD would not be paying him any commission on

24  the Product.

25       Plaintiffs' fraud claims are not barred by the statute of limitations, and Defendants'

26  motion for summary judgment is denied as to these claims.

27

28

10

C.  Independent Wholesale Representatives Contractual Relations Act of 1990

Plaintiffs claim that Defendants violated Cal. Civ. Code § 1738.15, and seek treble damages thereunder.  Section 1738.15 provides: "A manufacturer, jobber, or distributor who willfully fails to enter into a written contract as required by this chapter or willfully fails to pay commissions as provided in the written contract shall be liable to the sales representative in a civil action for treble the damages proved at trial."  A written contract is required "[w]henever a manufacturer, jobber, or distributor is engaged in business within this state and uses the services of a wholesale sales representative, who is not an employee of the manufacturer, jobber, or distributor, to solicit wholesale orders at least partially within this state, and the contemplated method of payment involves commissions."  Cal. Civ. Code § 1738.13(a).

A "wholesale sales representative" is defined as "any person who contracts with a manufacturer, jobber, or distributor for the purpose of soliciting wholesale orders, is compensated, in whole or part, by commission, but shall not include one who places orders or purchases exclusively for his own account for resale *and shall not include one who sells or takes orders for the direct sale of products to the ultimate consumer*."  Cal. Civ. Code § 1738.12(e).

According to Defendants, at no time were any of the Plaintiffs a wholesale representative.  (Motsenbocker Decl. ¶ 13.)  Any orders placed by Plaintiffs for Defendants' products were for their own account or were for direct sale of products to the ultimate consumer.  (Id. at ¶ 14.)  Plaintiffs do not dispute that they made direct sales to the ultimate consumer.  Therefore, Plaintiffs were not "wholesale sales representatives" and cannot seek recovery under section 1738.15.

Defendants' motion for summary judgment is granted as to Count XIII.

D.  Equitable Claims

Plaintiffs have brought equitable claims for quantum meruit (Count III), unjust enrichment (Count IV), and accounting (Count X).  The Court grants in part and denies in

1    part Defendants' motion for summary judgment as to these claims.

2         Defendants argue that there is no evidence that they received valuable services,

3    improvements, or any enrichment as a result of Plaintiffs' activities, because Defendants did

4    not profit from Plaintiffs' activities.  The Court disagrees.

5         First of all, there is a genuine issue of material fact with respect to whether Defendants

6    made a profit from Plaintiffs' activities.  Plaintiff has presented evidence that Home Depot

7    made sales of "Lift Off Paint & Varnish Remover" totaling $623,394.  It does not appear that

8    this revenue was included in Defendants' profit calculations.  (See Motsenbocker Decl. ¶ 7.)

9         Moreover, whether Defendants made a profit is not the proper measure of whether

10   Plaintiffs are entitled to recovery under the theories of quantum meruit and unjust

11   enrichment.  The theory underlying quantum meruit recovery is as follows: "Where one

12   performs for another, with the other's knowledge, a useful service of a character usually

13   charged for, and the latter expresses no dissent, or avails himself of the service, a promise

14   to pay the reasonable value of the services is implied." Spires v. American Bus Lines, 158

15   Cal. App. 3d 211, 216-17 (1984) (quoting Gray v. Whitmore, 17 Cal. App. 3d 1, 24 (1971)).

16   The labor involved in making sales for Defendants or facilitating sales through the

17   preparation of promotion materials has a reasonable value independent of Defendants'

18   bottom line.  The work Plaintiffs performed in connection with creating the promotional

19   materials used by Defendants and marketing the Product also has a reasonable value.

20        Unjust enrichment is based on the idea that "one person should not be permitted

21   unjustly to enrich himself at the expense of another, but should be required to make

22   restitution of or for property or benefits received, retained, or appropriated, where it is just

23   and equitable that such restitution be made, and where such action involves no violation or

24   frustration of law or opposition to public policy, either directly or indirectly." County of San

25   Bernardino v. Walsh, 158 Cal. App. 4th 533, 542 (2007).  If Defendants deceived Plaintiffs

26   into performing work in connection with the promotion and sales of the Product and Finish

27   Coat, Defendants would be unjustly enriched if the 10% commission promised to Plaintiffs

28

1   went into Defendants' pockets.[2]  Whether Defendants ultimately made a profit on the Product

2   and/or Finish Coat is irrelevant to the analysis.

3          As for Plaintiffs' accounting claim, an accounting is essentially an equitable remedy

4   "designed to prevent unjust enrichment by requiring the disgorgement of any benefit or profit

5   received as a result of a breach of fiduciary duty." 1A C.J.S. Accounting § 6 (2008).  Because

6   the unjust enrichment claim survives summary judgment, the accounting claim survives as

7   well.

8          However, the statute of limitations for Plaintiffs' quasi-contractual claims is two years.

9   Cal. Civ. Proc. Code § 339; Roots Ready Made Garments v. Gap, Inc., 2007 WL 3045999

10  (N.D. Cal. Oct. 18, 2007).  Therefore, Defendants' motion for summary judgment is granted

11  to the extent that the claims seek relief based on benefits or services received by Defendants

12  outside of the limitations period.  Defendants' motion is otherwise denied as to these claims.

13         The Court rejects Defendants' contention that Plaintiffs' claims are barred by the

14  equitable doctrine of laches.  To the extent that Plaintiffs' claims are based on benefits or

15  services received by Defendants *within* the two-year limitations period, Plaintiffs brought the

16  claims within a reasonable amount of time, and Defendants have not suffered prejudice by

17  any delay in filing suit.

18

19  E.  Jurisdictional Amount

20         Defendants suggest that the Court lacks jurisdiction over this action because Plaintiffs

21  have not shown that they suffered damages in excess of $75,000.  However, the allegations

22  of the complaint control for purposes of determining the amount in controversy if the plaintiff's

23  ────────────────

24         [2]  In connection with their unjust enrichment claim, Plaintiffs allege that they made substantial improvements to the Product by performing valuable services to Motsenbocker Developments.  (FAC ¶ 75.)  Plaintiffs clarify that they do not mean that Plaintiffs improved

25  the formula of the Product, but, rather, improved the Product in the general sense that they marketed the Product to a different industry and promoted the Product in various ways.  The value of Plaintiffs' services in this regard may be recoverable under the theory of quantum

26  meruit, discussed supra.  Unjust enrichment focuses on the *restitution* of benefits retained.

27  "Typically, the defendant's benefit and plaintiff's loss are the same, and restitution requires the defendant to restore plaintiff to his or her original position."  Walsh, 158 Cal. App. 4th at

28  542.  In this case, restitution would consist of the 10% commission that allegedly should have been paid to Plaintiffs but was improperly withheld by Defendant.

13                                                                              07cv773 BTM(NLS)

claim is apparently made in good faith.  <u>St. Paul Mercury Indemnity Co. v. Red Cab Co.</u>, 303 U.S. 283, 289 (1938).  The allegations of the Complaint and First Amended Complaint support a finding that the amount in controversy exceeds $75,000, and there is no indication that the allegations were made in bad faith.  Therefore, the Court continues to have jurisdiction over this case.

## V.  <u>CONCLUSION</u>

For the reasons discussed above, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** as to Counts I, II, and XII (breach of contract claims) in addition to Count V (promissory estoppel/detrimental reliance) to the extent that Plaintiffs seek to recover for breaches of the contract that occurred prior to April 27, 2005. The motion is otherwise **DENIED** as to Counts I, II, XII and V.  The motion is **DENIED** as to Counts VII (misrepresentation), VIII (negligent misrepresentation), IX (breach of fiduciary duties), and XI (declaratory relief).  The motion is **GRANTED** as to Counts VI (tort arising from breach of contract) and XIII (violation of Wholesale Representatives Contractual Relations act of 1990).  The motion is **GRANTED** as to Counts III (quantum meruit), IV (unjust enrichment), and X (accounting) to the extent they seek relief based on benefits or services received by Defendants prior to April 27, 2005.  Defendants' motion is otherwise **DENIED** as to these claims.

**IT IS SO ORDERED.**

DATED:  July 21, 2008

_Bury Ted Moskowitz_
Honorable Barry Ted Moskowitz
United States District Judge